## UNITED STATES DISTRICT COURT FOR
## SOUTHERN MARYLAND

**NORMAN WILLIAMS, et al.,**

        **Plaintiffs,**

    **v.**

                                   **Case No:8:14-CV-03124-TDC**

**ROMARM S.A.,**

        **Defendant.**

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

      Plaintiffs, Norman Williams and Diane Howe, as Legal Representatives of J.H., Kevin Attaway and Jamel Blakeley file their Opposition to Romarm's Rule 12 Motion to Dismiss.

      This case was re-filed in the local Maryland Circuit Court, pursuant to Maryland Rule 2-101, Maryland's Savings Statute, after the case was dismissed for lack of personal jurisdiction in the United States District Court for the District of Columbia and affirmed on appeal at the District of Columbia Circuit on August 18, 2014 in the same styled case of **Williams, et al. v. Romarm S.A.**, in 756 F.3d 777 (D.C. Cir. 2014).

      This case arises from discharges of a Romarm S.A. (Romarm) AK-47 style assault weapon (WASR 10) killing J.H. and injuring Plaintiffs Attaway and Blakeley on the streets of Washington, D.C. in March 2010. Romarm admits that the incident weapon in this case originated in the State of Maryland. Dkt.6;5/14/12/Am.Mot.Dism. ftn.2 ("Indeed, upon information and belief, the incident firearm was stolen from Maryland…").

1

**I.    TWO (2) JURISDICTIONAL STANDARDS ARE PRESENTED FOR THIS COURT TO ASSUME JURISDICTION IN THIS CASE**

Two (2) jurisdictional standards are presented to determine whether this Court may assume jurisdiction over this case. (1) Whether Romarm, which by its admission, claims to be an arm of the Romanian government, i.e., an integral part of the government, requiring this Court to assume jurisdiction based on the Foreign Sovereign Immunity Act (FSIA). Its only condition being that Romarm has been served process and then subject matter jurisdiction, including personal jurisdiction, is assumed.

If alternatively, it is discovered that Romarm acts separately from the Romanian government, and as such, is an independent "agency or instrumentality" of that government, not acting on its behalf, it must be granted constitutional due process, as would be granted any private party.

At this stage of the proceedings, where only a Motion to Dismiss has been presented and no discovery has occurred, Plaintiffs have only a *prima facie* burden to prove jurisdiction on both jurisdictional alternatives presented.

Under either of the above circumstances for a *prima facie* showing that this Court must assume jurisdiction we have a starting point to answering that question from Romarm's website attached as Ex. A to Plaintiffs' opening Complaint in the Circuit Court for Prince George's County before the case was removed here.

This is what Romarm S.A. claims to be, in pertinent part:

> The Romanian National Company ROMARM S.A. is a modern Holding structure with 100% Romanian state own(sic) capital, under the authority of Ministry of Industry and Resources. With a long tradition in the Defence Industry, materialized in an in an experience of over 75 years in military production …

2

Romarm's statement corresponds to Plaintiffs' Complaint No. 7 which states in part:

> Defendant, Romarm, is a 100% state owned organ of the Romanian
> government, and as such, is a "foreign state" for purposes of the [FSIA]
> and 'personal jurisdiction over a foreign state shall exist as to every claim
> for relief over which the [local] or district courts have [subject matter]
> jurisdiction under' 28 U.S.C. Sec. 1603 (a) and where 'service has been
> made under' Sec. 1608.

## II.    THE FORMER CASE, DISMISSED ON JURISDICTIONAL GROUNDS, DOES NOT PRECLUDE JURISDICTION HERE

The re-filing of **Williams, et al. v. Romarm S.A.,** after dismissal in the District

Court and D.C. Circuit on jurisdictional grounds, is not preclusive here for two (2)

reasons: (1) Romarm's "foreign state" status for automatic jurisdiction, was ruled by the

D.C. Circuit that "[h]owever weighty this argument might be…" because it had not been

steadfastly pursued it was not considered. **Williams v. Romarm S.A.**, 756 F.3d 777,782

(D.C.Circuit 2014)

(2) Having construed Romarm's status as that of an independent entity owed due

process, the appellate court in the former case found that no jurisdiction was available in

the District of Columbia. The Circuit's position was stated briefly as follows:

> Appellants must allege conduct specific to the forum in some way.
> Yet the only District-specific information Appellants proffer is that
> *some* Romarm-manufactured weapons have ended up in the District
> through criminal trafficking. Here, we do not even have the isolated
> *sale* that *Nicastro* found insufficient… this cannot satisfy due process.
> **Williams**, at 785 (emphasis in text) (*Nicastro* found that one sale was
> insufficient for due process purposes.)

Obviously, the basis for the Circuit's opinion before was that assault weapons

cannot be sold into the District of Columbia to satisfy due process considerations.

Whereas in the State of Maryland, where such weapons are profuse, it is because they

can be legally sold into this forum. Once discovery can be conducted, how extensive

3

Romarm's product reach this market, will easily determine that its reach is far beyond a "single product" that reached the forum in *Nicastro* with its due process implications.

Consequently, under either theory presented: Whether it be Romarm's governmental connection, having not been considered in the court before, or that Romarm's due process, when considered as a private corporation, protected it when there were no reported sales into the District of Columbia where such arms are prohibited.

Here, the jurisdictional facts and theories of Romarm's relationship to the Romanian government and its relation to this forum for due process purposes are on a vastly different plain. First, Plaintiffs' Complaint steadfastly alleges that "Romarm, is a 100% state owned organ of the Romanian government, and as such, is a 'foreign state' for purposes of the [FSIA], and '[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the [local] or district courts have [subject matter] jurisdiction under' 28U.S.C.Sec. 1603(a) and 'where service is has been made under Sec. 1608.' " Comp. no. 7

Secondly, it is alleged that "Romarms [sales] have a 'direct effect' in the United States" (Comp. no. 8) and most critically, the incident weapon in this case was "transported from Maryland". Comp. 4

With these allegations and admissions that are forthcoming below, it is indisputable that the incident weapon was *sold* into Maryland and if that is so, the inference that similar assault weapons were sold here as well into the Maryland market to support jurisdiction, either Subject Matter Jurisdiction under the FSIA for "foreign states" or to supply Personal Jurisdiction for due process protection, if needed upon a finding that  Romarm is classified as a private corporation, apart from the Romanian

4

government in the early stages of these proceedings when a *prima facie* showing is all that is needed.

### III.   VENUE IS PROPER IN MARYLAND WHERE THE 'ACT' OR 'OMISSION' OCCURRED AND IS LEAD PLAINTIFF'S DOMICILE

A "substantial part of the events or omissions giving rise to the claim occurred" is supportable in Maryland through 28 U.S.C.1391(b)(2);(e)(2). The Code carries a catch-all venue wherever the defendant can be found, if there is no other district where the action may be otherwise brought. 28 U.S.C. 1391(b)(3). The FSIA code citation is to 28 U.S.C. 1603(a)(1).

Through negligence of one or more of Maryland licensed dealers, purchasing the weapon at issue in this case and the fact that an abnormally dangerous product is an attraction for the illegal element to steal Romarm's products and transport it into the neighboring District of Columbia, supports allegations of negligence and public nuisance as "acts" leading to death and injury. *See* Comp. 18, 19.

In further support of the Maryland forum, is that lead Plaintiff, Norman Williams, the father and Legal Representative of his deceased son, J.H., is where he is domiciled for the past 34 years. Ex. A (by Certification) Williams temporary residence in the District of Columbia, as shown by an earlier address, notwithstanding.

### IV.   PLAINTIFF KEVIN ATTAWAY AND JAMEL BLAKELEY WERE MOVED INTO THE CASE UNDER THE RULES WHICH RELATES BACK

Plaintiffs Kevin Attaway and Jamel Blakeley were moved into the case by a Motion for Leave of Court to Amend [the] Pleadings and Join Similarly Situated Parties, through Fed.R.Civ.P 15(a) and 20 in the former action and re-filed here. Dkt.17; 10/03/2012. Due to an error in formatting the motion, for failure to furnish the Court with

5

a copy of the original pleadings attached to the Motion for Leave, it was temporarily stricken. Although a copy of the original pleadings was already before the Court.

Significantly, 28 U.S.C. Sec. 2072 states: "A local rule must be consistent with Acts of Congress." Advisory Committee Notes and its 1995 Amendment, Subsection (a) state: "It is the intent of this rule that a local rule may not bar any practice that these rules explicitly or implicitly permit."

Although the Amendment may have not complied with the Local Rules it did not violate the Federal Rules of Procedures for amending parties into the case, which was timely filed in the former U.S. District Court case of **Williams, et al v. Romarm S.A.** Dkt.17;10/03/2012.

Even though the pleading requirements were incomplete, the Motion for Joinder would still relate back under Rule 15(c) of the Federal Rules of Procedure which provides that "[a]n amendment of a pleading relates back to the date of the original pleading when … the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or *attempted to be set forth in the original pleading*[.]" (emphasis added)

Consequently, Defendant Romarm, was provided adequate notice of their entry into the case and they should be admitted in the re-filing *nunc pro tunc*. Plaintiffs, Attaway and Blakeley's injuries arose from the same Romarm weapon which killed J.H., and is causally linked to his death. Their injuries belong to a common nucleus of operative facts. Ex. B ( Motion)

6

### V.     ROMARM'S ALLEGATION THAT IT WAS NEVER SERVED PROCESS IS FALSE AND IT CONCEDED SERVICE IN THE SECOND RE-FILING OF THE CASE IN THE DISTRICT OF COLUMBIA

Romarm's allegation that it was never served in the first filing of this case, in the Superior Court of the District of Columbia is false. *See* Line3-4Def.Mem., at 2. In fact, Romarm personally "Answered" the Complaint by filing a response to the Superior Court and to Plaintiffs' counsel. Wherein Romarm states: "We National Company ROMARM S.A. … respond within the legal complaint filed by NORMAN WILLIAMS, DIANE HOWE, ecc., registered in Superior Court of District of Columbia, Civil Divisioin with No. 2011 CA 2349…"Ex.C  (Romarm's pro se Response to Complaiant)

This "Answer" comports with the Memorandum Opinion of Judge Emmet Sullivan, after the case was removed to the District Court for the District of Columbia as 1:12-CV-00436-EGS in confirming service in a footnote of his Opinion: "Defendant does not contest that service was properly made." Mem.Opin., at 8, ftn.3

Considering that the U.S. District Court case, Judge Sullivan presiding, was the *second* case filed after the initial filing in the Superior Court where Defendants failed to object to service from the initial filing, it can be concluded that the Defendant has conceded and waived any additional service. Now that the case has been re-filed here, Romarm is hardly in a position at this stage of the proceedings to revoke its consent to service at this late date after having conceded and waived it in the District of Columbia re-filing.

Notably here, the same lead attorney representing Romarm in the earlier case has noticed the court he intends to enter this case again *pro hac vice*. The local law office

petitioning him in will be the law firm with the same attorney who acted as local attorney in the former case as the same attorneys continue to represent Romarm throughout all of proceedings. Further, the New Jersey attorney, Anthony Pisciotti, who argued the former case was served by registered mail at his address and did not decline to represent Romarm in the latest re-filing.

## VI.   OPPOSITION TO MOTION TO DISMISS FOR JURISDICTION REQUIRES ONLY A *PRIMA FACIE* BURDEN IF NO DISCOVERY

At issue in this case is whether jurisdiction over Romarm is assumed through the FSIA's statutory subject matter jurisdiction, with personal jurisdiction, as service of process has been completed or conceded. Under the FSIA Romarm's activity must have only a statutory "direct effect" or "substantial contact" with the United States for there to be an assumption of jurisdiction over this case. 28 U.S.C. Sec. 1605 (a)(2)

Despite the fact that it sells its weaponry at the point of origin in Romania to its exclusive United States distributor, Century, for it to be marketed throughout the United States, including Maryland (but excluding the District of Columbia) it is sufficient to warrant jurisdiction at the pre-discovery stage. As Plaintiffs' showing of jurisdiction remains limited to only a *prima facie* burden to prove jurisdiction. *See* **MWANI v. BIN LADEN**, 417 F.3d 1,7 (D.C.Cir. 2005). ("[plaintiffs] may rest their argument on their pleadings, bolstered by affidavits and other written materials as they can otherwise obtain.")

It stands to reason that there exists a distinction without a difference whether Romarm sells to Century abroad, as opposed to here in the United States, as its products, along with their dangerous propensity, are marketed to each of the fifty (50)

with the exception of the District of Columbia where weapons sales are banned.

If it is concluded at this stage, tentatively, that Romarm is basically a "foreign state" with subject matter jurisdiction presumed, it would hardly matter what method it uses sell and market its products, as long as they are found in the United States and therefore have a "direct effect" or "substantial contact" with it. That "direct effect" is felt by U.S. citizens who are victimized by use of the weapon for the purpose it was designed, to shoot to kill or injury human beings. Police records used in the former case showed that "forty-one weapons manufactured by Romarm were recovered within the District [of Columbia] during a four-year-period." **Williams**, at 785

Under the circumstances of Romarm acting on behalf of the foreign state of Romania, including subject matter jurisdiction, pursuant to the FSIA, there is no need to determine whether the "foreign state" has "minimal contacts" in this country for purposes of personal jurisdiction. Because no Due Process is due. **L.T. Consultants v.Pakiston**, 351 F.3d 1184, 1191 (D.C.Cir.2003). *See also* 28 U.S.C. 1330(b) and 1608.

That is to say that "when a foreign sovereign controls an instrumentality to a degree that a principal-agent relationship arises between them, the instrumentality receives the same Due Process protection as the sovereign: none." **GSS Group Ltd. v. National Port Authority**, 680 F.3d805,815 (D.C. Cir. 2012) (emphasis added)

Whether an "agent or instrumentality" is so governed by its foreign state to qualify as a "foreign state" was the issue in **TMR Energy Ltd. v. State Property Fund of Ukraine**, 411 F.3d. 296,301-02 (D.C. Cir. 2005), also, and the court determined from the record that "Ukraine had plenary control over the SPF" … the SPF is an agent of the State … and should not be treated as an independent juridical entity."

9

This is duplicative of how Romarm portrayed itself in the previous case, that "[f]or purposes of applying the FSIA, a company that is *wholly owned* by a foreign state is considered a "foreign state" … Further, ROMARM is completely owned by Romania and operates under the authority of the Romanian Ministry of Economy and Commerce." Def.Am.Mot.to Dism. Dkt.6;5/14/2012, at 2 (1:12-CV-00436-EGS)

Admissions of Romarm's attorneys that it is a "100% wholly owned" enterprise is replete from those admissions made in the former case which was never resolved by the former courts, "foreign state" status having only been belatedly argued.

Instead, the argument rested primarily on the fact that Romarm had satisfied its due process requirements of :minimum contacts" with the District's forum, not through its sales, but through known criminal activity, which trafficked its weapons to the District, from nearby states such as Maryland, where sales are legal.

The alternative issue presented is whether personal jurisdiction is achieved if it is found on the record that Romarm is independent from the Romanian State and does not answer to it as its agent.

The question then raised is whether there is "specific" personal jurisdiction due to Romarm's "minimum contacts" with the forum, rather than the *statutory* "direct effect" available under "foreign state[hood]", as found by statute through the FSIA.

As explained further in the former case between the parties,

> And because foreign state is not a 'person' protected
> by the Due Process Clause of the Fifth Amendment,
> minimum contacts between the foreign state and the
> forum state are not required for a court to constitutionally
> exert personal jurisdiction over the state. **Williams, et al.,
> v. Romarm, SA, et al.,** 756 F.3d 777,782 (D.C.Cir. 2014)
> *See GSS Grp. Ltd., supra,* at 813. (cit.om.)

Romarm maintains that it as an integral part of the Romanian government, yet, at the same time, seeks due process consideration as would a private party. It's position, as a government agent belonging to the sovereign itself is an attempt to seek absolute immunity, without the "commercial activity" exception that leaves it vulnerable to suit. Yet, how much closer a tie is there between this entity and the "foreign state" than what has been proclaimed by its own attorney in its argument in the District of Columbia.

> A company that is *wholly owned* by a foreign state is considered a "foreign state" … Further, ROMARM is completely owned by Romania and operates under the *authority* of the Romanian Ministry of Economy and Commerce. (emphasis added) at 2, 5/14/2012 Dkt.6. Def.Am.Mot.Dism.

In **GSS,** *supra,* contrary to what is being represented here as to Romarm's "foreign state" affiliation, defendant, Port of Authority, asserted that it was "legally separate from the Liberian government." at 809. The D.C. Court went so far as to concur in the Authority's argument that "the Port Authority[] manage[d] … its own unsubsidized finances; [had] the ability to sue and be sued in its own name, [and it had] independent property ownership." At 809,ftn.2.

In **GSS,** no argument was made that the Port Authority was an *agent* of the Liberian government, "the rule that closely-controlled instrumentalities have no due process rights did not apply." **GSS,** at 810 Furthermore, to its detriment it sought no pretrial discovery in contrast what Williams attempted in the former proceeding.

Here, at minimum, Romarm must be brought before this court. It declares it is "wholly owned" by the Romanian government. Any entity whose majority shares are owned by the foreign state qualifies it as an "agency or instrumentality of a foreign state

for subject matter jurisdiction purposes. *See also*, **GSS**, at 811. How closely intertwined Romarm is to the sovereign, is at minimum, an issue that cannot be resolved on a Motion to Dismiss. Similarly, its "minimum contacts" with the forum cannot be decided in thin air.

Any "presumption of separateness" will easily give way if the foreign entity "is so extensively controlled by its owner [the foreign state] that a relationship of principal and agent is created." **GSS**, at 814, citing **First National City Bank v. Banco Para el Commercio Exterior de Cuba,** 462 U.S. 611, 629 (1983)

How independent is Romarm from the sovereign of Romania? What we are given from its attorneys is that it is both a "private" entity, deserving of due process protection. And, on the other hand, we learn that it is "wholly owned" and "100% owned [by the sovereign]". The reason such contradictory arguments are so abused here is that if Romarm belongs to the sovereign itself, no liability may attach to the "commercial activity" exception to the FSIA, if it can argue that its weapons cross state lines illegally.

With sovereign immunity, there would be no legal accountability in negligence, public nuisance, or strict liability, based on its marketing strategy and inability to stop the never ending flow of its illegal weaponry having been sold abroad, despite its loyalty contract with distributor, Century on after sales. Ex. **D**(based on a Vermont lawsuit)

On the other hand, Romarm's defeat on the "foreign state" measure, will then require the Court to apply the stricter constitutional due process to protect it from U.S. jurisdiction. As it intends when its strategy is to sell its weapons, brought to the United States only sold to an exclusive U.S. distributor in their country of origin and not here. Hence, a well-crafted marketing ploy which attempts to limit its "direct contact"

12

with the United States, in the hope of shielding itself from liability through lack of jurisdiction to adjudicate, rather than defend on its liability.

Defendant's totality argument is that it must be presumed to be an "independent entity" from the state of Romania and therefore "minimum contacts" are required for this court to assert jurisdiction over it. Def.Mem.,at 8. If that is so, then what does "wholly owned" by the sovereign mean? In particular when its\ claims its very existence arises from and within the Ministry of Economy and Commerce. Dkt. *supra.*

Its website also shows Romarm's origin to be the Defence industry of Romania, which continues to offer speculation that the Defence Industry is manufacturing the weapons sold here and are sharing the profits with the other government agencies, it has named as its affiliates, who promote the sale of the Defence products through the brand name Romarm. *See* Ex. A (Plaintiff's Complaint Exh. A)

**VII.   PLAINTIFFS IS NOT ESTOPPED BY LAW OF THE CASE
WHERE AN ARGUMENT WAS NEVER CONSIDERED BY THE
FORMER COURTS ON THE QUESTION OF JURISDICTION**

Defendant, Romarm, in its Argument, at 9, places great emphasis on a "doctrine of law" not permitting the Plaintiffs to "re-litigate an issue … already decided" in the former case. Although, the Defendant concentrates solely on lack of personal jurisdiction found in the adjoining circuit court, the Defendant ignores the fact that the Plaintiffs *failed* to litigate Romarm's ownership by the sovereign state of Romanian, or that it argued it *too late* to be considered by the appellate court, which allowed the critical issue of Romarm's "foreign state" status to be waived for lack of raising it steadfastly.

Here is what the D.C. Circuit had to say about Plaintiffs' argument, or lack thereof, concerning Romarm's "foreign state[hood]":

13

> At oral argument, Appellants primarily challenged the district
> court's conclusion that Romarm is juridically independent from
> Romania and thus entitled to due process. Specifically,
> Appellants pointed to a claimed "concession" by Romarm that
> it is both owned *and operated* by Romania. This concession, they
> say, establishes Romarm as a state entity that is not entitled to due
> process. However weighty this argument may be, we decline to
> consider it because Appellants failed to raise it in their briefs.
> **Williams**, at 782 (emphasis in text)

Williams can hardly "re-litigate" what was never, in the court's opinion,

brought to the attention of the court in a timely fashion, and not having been ruled upon

or even considered by the D.C. Circuit in its affirmance of the District Court.

What is left is the D.C. Circuit's opinion concerning personal jurisdiction over

Romarm in the District of Columbia. Commenting on Plaintiffs' request for limited

discovery to attempt to show Romarm's presence in the District of Columbia:

"Appellants have failed to allege any conduct by Romarm that was purposely directed

toward the District of Columbia." **Williams**, at 787 The problem being that Romarm

could not sell its weapons into the District of Columbia, while it may sell them to other

forums, including the State of Maryland.

The District Court's concern over jurisdiction in the District of Columbia stands

in stark contrast to the forum here where Romarm weapons are sold to its licensed

dealers and distributors having been distributed to the State's dealers by Romarm's

exclusive distributor Century. Under such circumstances, Romarm can be found to have

a "direct effect" with its commercial activity, including this State, which is all that is

required by the FSIA.

Further, such "tortious acts", as negligence, may occur in this forum where the

weapons originate before reaching the District of Columbia. Although District law, D.C.

14

Code Sec. 7-2551.02, its Assault Weapon Manufacturing Strict Liability Act of 1990 (SLA), provides liability for assault weapons which kill and injure its citizens in the District of Columbia, and would be adopted by this Court under Maryland's Choice of Law, once personal jurisdiction is found where the tortious acts occurred, responsible for allowing weapons, such as the incident assault weapon into a forum where injuries and death occurred.

### VIII. STATUTE OF LIMITATIONS ARE NOT A BAR TO EITHER WRONGFULL DEATH OR SURVIVAL ACT CLAIMS

Plaintiffs re-filed their second lawsuit in the United States District Court for the District of Columbia on March 20, 2012 in order for the Plaintiffs to take advantage of the extension of the District's Wrongful Death Act which from one (1) to two (2) years passed by the District's City Council in a Wrongful Death Emergency Act (D.C. Code Sec. 16-2702) two (2) days before the case was re-filed.

This law, if nothing else gave <u>actual notice</u> to the Defendant of the Act's passage which had the remedial purpose of extending time for attorneys to locate the families of victims of violence. The Emergency Act specifically focused on this case as an example of the difficulty in filing Wrongful Death claims within the short period of one (1) year. Although the Act may not have been signed into law by the mayor until a month later, it had the retroactive affect of a remedial act and gave substantial notice to the Defendant in sufficient time to put it on notice so that evidence would be protected when the Plaintiffs re-filed their action within 2 years of the Plaintiffs death and injury.

Defendant, Romarm, also ignores the fact that there is a 3 year Survival Act, D.C. Code Sec. 12-101, enforceable in particular, by Plaintiffs' Williams and Howe for the

horrendous injuries, and pain and suffering, at the time of the death of their son J.H.

(Comp.No. 16).

Furthermore,  injuries to Plaintiffs, Attaway and Blakeley are also covered by

tortious injuries within the 3 year statute of limitations in the District.

## CONCLUSION

Plaintiffs' allege there is jurisdiction in this Court, either under the FSIA, as

Romarm is a "foreign state", or acts as its agent, and if not, under due process, as it

would be granted to a "private" person. Defendant, Romarm's, proliferation of weapons

into the U.S. market establishes its "direct effect" here, or at minimum the "minimum

contacts" necessary for specific or general jurisdiction for maintaining suit in this forum.

Liability may be alleged based on its negligence in selling its dangerous products

in Maryland, which then flow into neighboring District of Columbia, where strict liability

under the SLA, is available by adopting Maryland's Conflict of Law, or Choice of Law

considerations.

At this stage of the proceedings, where no limited jurisdictional discovery

has occurred, Plaintiffs' have only a slight *prima facie* burden to show that jurisdiction

exists in this forum, not having been considered in this Court's Sister jurisdiction of the

District of Columbia.

Respectfully submitted,

Daniel Wemhoff, Esq. #092/5
4600 S. Four Mile Run #831
Arlington, VA 22204
(703) 589-2199

16

## CERTIFICATE OF SERVICE

I hereby certify that I have filed a copy of the Plaintiffs' Opposition to Defendant's Motion to Dismiss to opposing counsel, John Parker Sweeney, Esq. by the Court's ECF system to the opposing attorney on this date, the 29th of October, 2014.

Daniel Wemhoff

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND

**NORMAN WILLIAMS, ET AL.,**

       **Plaintiffs,**

       **v.**

                      **Case No: 8:14-03124-TDC**

**ROMARM S.A.,**

       **Defendant.**

### <u>CERTIFICATION</u>

I certify that I am the lead plaintiff in this lawsuit as father and legal representative of J.H.

1. I have been a resident of the State of Maryland since _1980_ and continue to live in the State of Maryland.

                              *Norman Williams*
                              NORMAN WILLIAMS

PLAINTIFF'S
EXHIBIT

B

Blumberg No. 5119

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NORMAN WILLIAMS,
DIANE HOWE,
And
KEVIN ATTAWAY,
JAMEL BLAKELEY,

        C.A. No: 1:12-cv-00436
        J. Emmett Sullivan

      Amended Plaintiffs,

      v.

ROMARM, et al.,

      Defendants.

### AMENDED COMPLAINT

KEVIN ATTAWAY and JAMEL BLAKELEY are amended to be parties to this Complaint as

follows:

1.  Jurisdiction is founded on DC Code 13-423d (a) (3) based on the tortuous injury to the

amended parties, Kevin Attaway and Jamel Blakeley, having occurred in the District of Columbia

(District);

2.  This case is brought under the District of Columbia's Assault Weapon Manufacturing

Strict Liability Act (SLA), DC Code 7-2551.01; It is founded on strict liability, negligence and public

nuisance;

3.  On or about March 30, 2010, both Kevin Attaway and Jamel Blakeley were shot and

wounded in the vicinity of S. Capitol Street SE in Washington, D.C., both severely wounded by

one or more multiple shots to their bodies from an assault weapon (AK-47 style) manufactured by

ROMARM, as defendant.

4.  Kevin Attaway and Jamel Blakeley were personally injured by the same weapon identified

as the Metropolitan Police Department of the District as the one which killed the plaintiffs, Norman

Williams and Diane Howe's son, Jordan Howe, on or about March 13, 2010;

     5.  Kevin Attaway was partially paralyzed and may have suffered permanent injuries from his wounding by an assault weapon manufactured by the defendant, ROMARM;

     6.  Jamel Blakeley was shot in the back by the same weapon that shot both Kevin Attaway and killed Jordan Howe;

     7.  Kevin Attaway seeks damages for personal injuries in the amount of Ten Million ($10,000,000) Dollars due to his temporary, permanent injuries and paralysis;

     8.  Jamel Blakeley seeks damages for personal injuries to his back in the amount of Five Million ($5,000,000) Dollars;

     9.  Further, Plaintiffs, including Williams and Howe seek attorney fees and costs related to this action.

Respectfully submitted,

Daniel Wemhoff, Esq. #420233
4600 S. Four Mile Run Dr. #831
Arlington, VA 22204
(703) 589-2199
e-mail:danwem@yahoo.com

Included this date, the 3rd of October 2012.

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

WILLIAMS, et al.,

     **Plaintiffs,**

  v.

ROAMARM, et al.,             **C.A. No: 1:12-cv-00436**
                                **J. Emmett Sullivan**

     **Defendants.**

## PLAINTIFFS' MOTION FOR LEAVE OF COURT TO AMEND PLEADINGS AND JOIN SIMILARLY SITUATED PARTIES

Plaintiffs, Norman Williams and Diane Howe, seek leave of court, pursuant to Fed. R. Civ. P. 15(a) and 20, to amend the pleadings and join Kevin Attaway and Jamel Blakeley, whose injuries arise out of the same series of occurrence as that of Jorden Howe, in the underlying Wrongful Death and Survival Act, represented by his parents as legal representatives. Lead attorney for defendant, ROMARM, Anthony Pisciotti, was contacted by e-mail for his consent, but he has refused.

## LEGAL STANDARD

"[A] party may amend the party's pleading only by leave of court, or by written consent of the adverse party; (once a responsive pleading has been filed) and leave shall be freely given when justice so requires." Rule 15(a), *see also, Forman v. Davis,* 371 U.S. 178, 182 (1962).

"The D.C. Circuit has held that for a trial court to deny leave to amend is an abuse of discretion unless the court provides a sufficiently compelling reason, such as 'undue delay, bad faith, or dilatory motive…" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C.Cir.1996), quoting *Forman*, at 182 *supra*. The court may also deny leave to amend the complaint if it would cause undue prejudice to the opposing party. *See Forman*, at 182, *supra*.

**Rule 20(a):**

Fed. R. Civ. P. 20(a) provides, in part: "All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrences and if any question of law or fact common to all persons will arise in the action."

As held by this court, "[t]he purpose of Rule 20 is to promote trial convenience and expedite the final resolution of disputes, thereby preventing multiple lawsuits, extra expense to the parties and loss of time to the court as well as the litigants appearing before it." *M.K. v. Tenet*, 216 F.R.D. 133, 137 (D.D.C. 2002).

There are two prerequisites for joinder under Rule 20(a): (1) a right to relief must be asserted by, or against, each plaintiff or defendant relating to or arising out of the same transaction or occurrence or series of transactions or occurrences, and (2) a question of law or fact common to all of the parties must arise in the action. *M.K*, at 138, *supra*.

Here, Plaintiffs, Williams and Howe, would satisfy the first prong of Rule 20(a), also known as the "transactional test," in that the plaintiffs' claims are "logically related" events which "arise out of the same transaction, occurrence or series of transactions or occurrences." *Call of the Wild Movie, LLC v. Does 1-1,062*, 770 F.Supp2d 332, 342 (D.D.C. 2011); Fed. R. Civ. P. 20(a). All "logically related" events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *M.K.,* at 142, *supra,* (citing to 7C Wright, Federal Practice & Procedure, Sec. 1653 at 270 (1972 ed.); case cit. om.

"Additionally, there must be common questions of law or fact. *Id.* 'Under the Federal Rules of Procedure, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.' " *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 243 (S.D.N.Y. 2012); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 724 (1966).

## QUESTION OF LAW OR FACT COMMON TO ALL PLAINTIFFS

"Rule 20(a)(2)(B) requires the plaintiffs' claims against the ... defendants to contain a common question of law or fact." *Call of the Wild Movie,* at 343, *supra.* The plaintiffs meet that requirement here.

This case involves a claim for the shooting death of the son of the plaintiffs. It invokes primarily the District of Columbia's Assault Weapon Manufacturing Strict Liability Act (SLA), D.C. Code 7-2551.01. Howe was shot and killed by a ROMARM AK-47 weapon on March 23, 2010. The purported parties to this action were similarly shot by the same ROMARM weapon, only a week later on March 30, 2010, while attending the funeral of Jordan Howe. The weapon had not been confiscated in the week  before the intended parties were shot and injured after Howe's shooting.

One of the young parties, Kevin Attaway, was seriously wounded, and although he survived, may have suffered permanent injuries. The other party sought to be joined, is a member of the same family (Jamel Blakeley) who was shot in the back from the same weapon. Their joinder is sought due to their personal injuries suffered as a result of the same weapon used in Howe's death and the Wrongful Death and Survival Act claims brought by his legal representatives.

Witnesses to the deaths and injuries are the same. The weapon being held at the Metropolitan Police Headquarters, used in the death and injuries a week apart, is the same assault weapon used in both circumstances. Medical reports, both autopsy, hospital and police, reside in the District of Columbia. The parties are interrelated due to the fact that the weapon used to kill Howe was also used to shoot and injure Howe's friends by the shooter's attempt to avenge an attempt on his own life resulting from his killing of Howe a week earlier. There is no criminal activity or gang-related activity connected to the parties and intended parties to this action that would bar them from suit by the SLA.

## STATUS OF THE CASE TO DATE

This case was refiled on March 21, 2012, in order to comply with an extension of the Wrongful Death Statute passed by the District of Columbia City Council for the avowed purpose of avoiding a statutory bar of One Year in the former Wrongful Death Statute which would have curtailed the Howe case filed more than One Year after his death in March 2010. The Survival Act, as are the personal injury claims, are not threatened due to the refiling as their statutory limitations are Three Years each.

Once the suit was refiled, Defendant ROMARM, timely Answered the Complaint and later filed for its dismissal on personal and subject matter jurisdiction grounds (ROMARM is a state entity and jurisdiction of the latter is governed by the Foreign Sovereign Immunity Act (FSIA). Meanwhile the Plaintiffs had attempted limited discovery based on defendants' jurisdictional objections. Later a motion to compel was filed. These motions have been lying dormant for several months with no action to date by the Court.

Consequently, with the case having yet to be calendered, there can be no interference with Court activity, nor could any prejudice inure to the defendants by the joinder of the additional parties on the pending motion here. Further, "proceeding with the [new parties'] claims as a single case would no doubt promote judicial economy and efficiency as it is anticipated that much of the discovery and depositions will be identical for [all] plaintiffs." *Kehr Ex Rel. Kehr v. Yamaha Motor Corp., U.S.A.,* 596 F.Supp.2d 821,828 (S.D.N.Y. 2008)

## CONCLUSION

Based on the legal standard and law or facts common to the purported plaintiffs the court is petitioned to allow Kevin Attaway and Jamal Blakeley to proceed as additional plaintiffs with similar and interrelated claims as those already filed by lead plaintiffs Norman Williams and Diane Howe.

Daniel Wemhoff, Esq. #420233
4600 S. Four Mile Run Dr. #831
Arlington, VA 22204
(703) 589-2199
e-mail:danwem@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2012, I caused the above Motion to be served electronically on defendants' Romarm's attorneys already appearing in this case.

Daniel Wemhoff

Case 8:14-cv-03124-TDC   Document 17   Filed 10/29/14   Page 26 of 29
Case 1:12-cv-00439-EGS   Document 2-2   Filed 04/06/12   Page 31 of 32
Case 1:11-cv-01924-ABJ   Document 1-1   Filed 11/04/11   Page 31 of 32



# ROMARM

**NATIONAL COMPANY FOR MILITARY TECHNIQUE**

district 6, Bucharest,
Postal Code 061301, Romania
Phone.: 004 021 3171971;
004 021 3171983
Fax: 004 021 3171984
E-mail: office@romarm.ro

PLAINTIFF'S EXHIBIT C
Blumberg No. 5199

NO. *5063 / 25.10.2011*

TO

- **Superior Court of the District of Columbia**
  **Civil Division**
  **Indiana Avenue 500, N.W., Suite 5000,**
  **Washington, D.C. 20001, phone no. (202)879-1133**
  **Case No.: 2349-11 NORMAN WILLIAMS vs. ROMARM**

- **DANIEL WEMHOFF, Esq. #420233**
  **4600 S. Four Mile run Dr. 831**
  **Arlington, VA 22204**
  **(703) 589-2199**

We National Company ROMARM S.A. with headquarters in Bucharest, Timisoara Blvd., no. 5B, district 6, postal code 061301, registered at O.R.C. of Bucharest Court with no. J40/10841/27.11.2000, with Unique Registration Code R 13554423. bank account no. RO18RNCB0090 0005 8660 0001 opened at BCR - Lipscani Branch, represented by General Manager Marius Vasile Crisan, respond within the legal complaint filed by NORMAN WILLIAMS, DIANE HOWE, ecc., registered in Superior Court of District of Columbia, Civil Division with No. 2011 CA 2349.

National Company "ROMARM" is a romanian legal entity, state owned and operates in accordance with the romanian law.

The company aims among other things, the manufacture and marketing of weapons and ammunition, ammunition and military equipment necessary for the national defense system components and other external or internal customers, in terms of competitiveness and profitability.

To achieve the object of activity, our company concludes commercial contracts with external partners, in compliance with the romanian legislation and international law.

From the establishment of the company until now, ROMARM supplied military weapons for government institutions in the United States and weapons for civil use for legal entities - traders based in the U.S. All commercial contracts concluded by N.C. ROMARM. S.A. with external partners regarding the supply of military weapons or for civilian use in the U.S. market have been completed in compliance with the legislation and strict enforcement of national (domestic) and international - BATF rules.

At no time N.C. ROMARM S.A. had signed to provide military weapons for civilian use or with individuals.

We believe that any fault can not be accepted in our task regarding this incident, object of complaint mentioned above, given that we always respected internal and international laws and regulations regarding arms trade.

Anyway, we think it would be useful to solve this issue, if the identification data of those weapons (series and year of manufacture) used in the event that resulted in the death of those involved would be sent to us.

This would be helpful to verify that the weapon in question was produced or not by N.C. ROMARM SA, and if the answer will be positive, we could identify the buyer of the weapons.

Given the above, we assure you of our full support to solve this case.

GENERAL MANAGER

VASILE MARIUS CRISAN

DISTRICT OF COLUMBIA SUPERIOR COURT
CIVIL DIVISION
JUDGE TODD E. EDELMAN



U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 AUG 29 AM 10: 17

CLERK

Y_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

CENTURY INTERNATIONAL ARMS, INC. )
and CENTURY ARMS, INC., )
                  Plaintiffs, )
                   )
    v. )         Docket No. 1:12-CV-114
                   )
M+M, INC., )
                Defendant. )

<u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Century International Arms, Inc., and Century Arms, Inc. (collectively

"Century"), by their attorneys Gravel & Shea PC, for their Amended Complaint against M+M,

Inc. ("M+M"), allege as follows:

<u>Introduction</u>

1.     Century is in the business of purchasing surplus firearms from overseas and, after

remanufacturing them to be compliant with U.S. law, reselling them to licensed dealers and law

enforcement personnel.

2.     Century has enjoyed a long-term contractual relationship with C.N. Romarm S.A.

("Romarm") and its affiliated factory, S.C. Fabrica De Arme Cugir S.A. ("FAC"), including the

exclusive right to purchase certain firearms. However, Century has learned that Defendant M+M

has purchased, and continues to purchase, such firearms from Romarm and FAC.

gravel &
  shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont 05402-0369
A PROFESSIONAL CORPORATION



13.     In addition to the 2011 Contract, Century Arms, Inc. and Romarm/FAC entered

into a Business Promotion and Protection Agreement (the "BPPA") on March 23, 2010, which

operates like an exclusivity contract.  Under the BPPA, the parties agreed to be loyal to each

other and work together to promote the sale of Romanian firearms and accessories in the United

States.

14.     Specifically, the BPPA prohibits Romarm/FAC from selling the items covered by

the agreement to other companies who would distribute them in the United States.

15.     However, at least part of the reason Romarm/FAC is not satisfying the 2011

Contract's requirements is that it is violating the BPPA by selling firearms to M+M.

16.     On information and belief, Romarm/FAC has already supplied M+M with 12,405

firearms and accessories in the last eighteen months and has agreed to supply M+M with an

gravel &
shea |ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 4 -