## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

NORMAN WILLIAMS, DIANE HOWE,
KEVIN ATTAWAY, and
JAMEL BLAKELEY,

      Plaintiffs,

      v.

ROMARM S.A.,

      Defendant.

Civil Action No. TDC-14-3124

## MEMORANDUM OPINION

Plaintiffs Norman Williams ("Williams"), Diane Howe ("Howe"), Kevin Attaway ("Attaway"), and Jamel Blakeley ("Blakeley") (collectively, "Plaintiffs") assert various causes of action against Defendant Romarm S.A. ("Romarm") arising from two shootings, during which the firing of an assault weapon marketed and sold by Romarm resulted in the death of the son of Williams and Howe and injuries to Attaway and Blakeley.  Pending before the Court are Romarm's Motion to Dismiss and Plaintiffs' Motion for Jurisdictional Discovery.  For the reasons stated below, the Motion to Dismiss is GRANTED, and the Motion for Jurisdictional Discovery is DENIED.

## BACKGROUND

This case arises from two shootings that occurred in Washington, D.C. in March 2010. The Complaint alleges that, on or about March 22, 2010, a Romarm WASR 10 semi-automatic assault weapon was discharged during an incident in the District of Columbia, resulting in the death of J.H., the son of Plaintiffs Williams and Howe, who are his legal representatives.  The

Complaint further alleges that on March 30, 2010, Plaintiffs Attaway and Blakeley were injured by the same weapon during a second incident in the District of Columbia that was "causally connected to the death of J.H." Compl. ¶ 6.

Romarm is a company that is wholly owned by the Romanian government and is engaged in the international marketing and sale of firearms. Plaintiffs allege that Romarm's gun sales and operations have a "direct effect" in the United States because Romarm sells firearms through its American distributor, Century Arms International ("Century") for distribution to dealers in the United States, including in Maryland, and maintains "supervision and control over the sale, distribution, and after-sale" of its firearms. *Id.* ¶¶ 8-9. According to factual allegations made by Century in a separate, unrelated lawsuit, Romarm sold more than $55 million in firearms to Century in the 10-year period preceding 2012. Plaintiffs allege that the "sale and purchase" of the assault weapon at issue occurred in Maryland, and that the firearm had been "transported from Maryland to the District of Columbia" for use in the shootings. *Id.* ¶¶ 3-4, 11.

On March 20, 2012, Williams and Howe filed a federal suit against Romarm in the United States District Court for the District of Columbia,[1] asserting claims for wrongful death, negligence, public nuisance, and, under the District of Columbia's Assault Weapon Manufacturing Strict Liability Act, D.C. Code §§ 7-2551.01–03 (West 2014), strict liability for manufacturing, assembling, or distributing the weapon that caused the death of J.H. On October 3, 2012, Attaway and Blakely attempted to join as plaintiffs by filing a Motion for Leave of Court to Amend Pleadings and Join Similarly Situated Parties. The court struck the motion because Plaintiffs failed to attach the proposed amended complaint to the motion, as required by

---

[1]  Prior to the federal suit, Williams and Howe had brought a state lawsuit against Romarm in the Superior Court of the District of Columbia. Romarm timely removed that state case to the United States District Court for the District of Columbia, which Williams and Howe then voluntarily dismissed after refiling their suit in federal court.

the court's local rules.  As Plaintiffs' Counsel acknowledged at oral argument, Plaintiffs never attempted to correct and refile their motion to amend the complaint.  Thus, Attaway and Blakely were never made parties to the suit.

On February 4, 2013, the district court granted a motion to dismiss filed by Romarm, finding that it lacked personal jurisdiction over Romarm.  Williams and Howe appealed the decision, but on July 1, 2014, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") affirmed the district court's dismissal of the case for lack of personal jurisdiction.

On September 2, 2014, Plaintiffs filed the present lawsuit in the Circuit Court for Prince George's County, Maryland against Romarm, alleging, on the basis of both the March 22, 2010 and March 30, 2010 incidents, the following five causes of action: (1) strict liability under the District of Columbia's Assault Weapon Manufacturing Strict Liability Act; (2) wrongful death; (3) "personal injury"; (4) public and private nuisance; and (5) negligent distribution and marketing.  Romarm removed the case to this Court on October 3, 2014 and filed the present Motion to Dismiss on October 10, 2014.  On January 22, 2015, after the Motion to Dismiss had been fully briefed, Plaintiffs filed its Motion for Discovery in Aid of Jurisdiction.

## DISCUSSION

### I.  Romarm's Motion to Dismiss for Lack of Personal Jurisdiction

In its Motion to Dismiss, Romarm argues that the Court should dismiss the Complaint on multiple grounds: lack of personal jurisdiction, improper venue, insufficiency of process, and because the claims are barred by the statute of limitations.  As jurisdiction is a threshold issue, the Court must first consider Romarm's argument that the case should be dismissed for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  Because the Court

concludes that it lacks personal jurisdiction over Romarm, it will not address Romarm's alternative arguments for dismissal.

### A.   Legal Standard

It is the plaintiff's burden to establish personal jurisdiction by a preponderance of the evidence. *See Mylan Labs. Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). To carry that burden at the pleading stage, the plaintiff need only make a *prima facie* showing that the defendants are properly subject to this Court's jurisdiction. *Id.* In evaluating the plaintiff's showing, this Court must accept the plaintiff's allegations as true and must resolve any factual conflicts in the plaintiff's favor. *Id.* The court is permitted to consider evidence outside the pleadings in resolving a Rule 12(b)(2) motion. *Structural Pres. Sys., LLC v. Andrews*, 931 F. Supp. 2d 667, 671 (D. Md. 2013); *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d. 757, 763-64 (D. Md. 2009).

### B.   Agent or Instrumentality of a Foreign State

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330 *et seq*. (2012), federal courts have subject matter jurisdiction over "any nonjury civil action against a foreign state" with respect to which the foreign state is not entitled to immunity. *Id.* § 1330(a). Although foreign states are generally immune from suit, the FSIA contains exceptions to that immunity in cases in which the action is based upon "a commercial activity carried on in the United States by the foreign state" or upon an act in connection with "commercial activity of the foreign state elsewhere" that has a "direct effect in the United States," or  in cases "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of

his office or employment." *Id.* § 1605(a)(2) and (5). The FSIA provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction . . . and where service has been made under § 1608." *Id.* § 1330(b).

The definition of a "foreign state" under the FSIA includes not only foreign sovereigns, but also any "political subdivisions of a foreign state or an agency or instrumentality of a foreign state," including any foreign corporation "a majority of whose shares . . . [are] owned by a foreign state." *Id.* § 1603(a)-(b). Here, the parties do not dispute that Romarm, which is wholly owned by the Romanian government, is an agency or instrumentality of Romania, and therefore qualifies as a "foreign state" under § 1603.

For purposes of personal jurisdiction, however, government instrumentalities established as "distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* (*"Bancec"*), 462 U.S. 611, 626-27 (1983). Typically, a state-owned entity "the structure and core function of which are commercial" is to be treated as an agency or instrumentality that is "separate and distinct from the sovereign." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005). Courts afford a presumption that a foreign government's determination that its instrumentality should be accorded separate legal status is to be followed, but that presumption may be overcome upon a showing that the foreign state so extensively controls the instrumentality "that a relationship of principal and agent is created." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009); *see also Bancec*, 462 U.S. at 629. Thus, if Romarm functions as an independent entity from the Romanian government, for purposes of personal jurisdiction analysis, Romarm is a "person"

under the Fifth Amendment of the United States Constitution, and due process requires that there

be sufficient "minimum contacts" between Romarm and Maryland. *Frontera*, 582 F.2d at 400;

*TMR Energy Ltd.*, 411 F.3d at 301-02.

In this case, because the United States District Court for the District of Columbia has

already decided this issue in the parties' prior case, the doctrine of collateral estoppel (issue

preclusion) bars Plaintiffs from re-litigating this question before this Court. Collateral estoppel

"bars successive litigation of an issue of fact or law actually litigated and resolved in a valid

court determination essential to the prior judgment." *Taylor v. Sturgell*, 553 U.S. 880, 892

(2008) (citation and internal quotation marks omitted). Here, the Court applies the federal

common law of collateral estoppel. Although Plaintiffs' claims are governed by state substantive

law, the Supreme Court has explained that in a FSIA case, the preliminary question of whether

an instrumentality, such as Romarm, has separate juridical status from a foreign nation is a

matter of federal law because of the "importance of developing a uniform body of law

concerning the amenability of a foreign sovereign to suit in United States courts." *Bancec*, 462

U.S. at 622-23 & n.11.[2] Thus, for purposes of collateral estoppel, "[t]he preclusive effect of a

federal-court judgment is determined by federal common law." *Taylor*, 553 U.S. at 891.

Under the federal common law of collateral estoppel, an issue is precluded when the

following conditions are met:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the
> issue must have been actually determined in the prior proceeding;
> (3) determination of the issue must have been a critical and necessary part of the

---

[2]  By comparison, courts have held that, once it has been established that a foreign state may be
sued under the FSIA, the forum state's choice-of-law rules apply. *See Oveissi v. Islamic
Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009); *Barkanic v. Gen. Admin. Of Civil Aviation
of the People's Republic of China*, 932 F.2d 957, 959 n.2 (2d Cir. 1991) ("Here there is no
question that [the defendant] is 'amenable to suit' under the FSIA; the only question is the extent
of [the defendant's] liability. As such, state law, rather than federal law, is controlling.").

decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.

*Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998). These conditions are met in this case. In the earlier case filed by Williams and Howe in the United States District Court for the District of Columbia, the parties litigated, and that court decided, the issue of whether Romarm is a sufficiently independent entity from the Romanian government such that minimum contacts are required. In its February 4, 2013 opinion, the district court held that "plaintiffs have failed to rebut the presumption of independent status between ROMARM and Romania," and therefore "the Court finds that 'minimum contacts' must be established between ROMARM and this forum in order to justify the Court's exercise of personal jurisdiction over ROMARM." *Howe v. Romarm*, No. 12-436(EGS), 2013 U.S. Dist. LEXIS 189153, at *12 (D.D.C. Feb. 4, 2013). Based on that ruling, the court went on to analyze the minimum contacts issue and determined that Romarm did not have such contacts with the District of Columbia. On July 1, 2014, the D.C. Circuit affirmed the district court's decision to dismiss the case for lack of personal jurisdiction on the grounds that Williams and Howe had failed to allege adequately a basis for minimum contacts. *See Williams v. Howe* ("*Williams I*"), 756 F.3d 777, 784-85 (D.C. Cir. 2014).

Thus, the first three conditions are met in that (1) the issue before this Court is the same as that previously litigated before the United States District Court for the District of Columbia, namely whether Romarm is an independent entity for which minimum contacts are required; (2) the court issued a judgment on the merits of the issue; and (3) the court's judgment on the issue, which resulted in dismissal of the case for lack of personal jurisdiction, was a critical and necessary part of the decision.

The fourth condition is also met because the judgment was final and valid.  Plaintiffs argue that because the D.C. Circuit did not consider on appeal the issue of whether the district court correctly decided that Romarm was an independent entity for personal jurisdiction purposes, they are not precluded from raising the issue again before this Court.  However, the D.C. Circuit did not consider the issue because Williams and Howe did not raise this issue in their appellate brief and improperly sought to argue it for the first time at oral argument before the D.C. Circuit. *See Williams I*, 756 F.3d at 782-83 ("Whether it was an intentional strategy or a simple case of overlooking the record, Appellants cannot "sandbag" Romarm.  Questions not presented and argued by the parties in a sequence affording appropriate consideration are forfeited, and we accordingly decline to rule on the issue since it was not properly raised.").  Thus, the district court's ruling constitutes a final judgment on the merits of the issue.  The fifth condition is also satisfied, as Williams and Howe had a full and fair opportunity to litigate the issue.

As for Attaway and Blakeley, they were not a party to the earlier case because Williams and Howe never attempted to refile their motion to join them in the case after the district court struck their first motion to amend.  Nevertheless, Attaway and Blakeley are also barred from relitigating this issue because they are parties in privity with Williams and Howe.  Although as a general rule, "collateral estoppel ordinarily applies only against persons who were parties to the prior suit," under some circumstances, "nonparties can be precluded from relitigating issues determined in a prior suit," such as when a non-party is in privity with a party to a former litigation. *Martin v. Am. Bancorporation Retirement Plan*, 407 F.3d 643, 654 n.18 (4th Cir. 2005) (internal quotation marks and citations omitted).  Privity does not require "an exact identity of parties," rather "[t]wo parties can be said to be in privity when 'the interests of one

party are so identified with the interests of another that representation by one party is representation of the other's legal right." *Universal Furniture Int'l, Inc. v. Frankel*, 538 F. App'x 267, 270-71 (4th Cir. 2013) (internal quotation marks and citation omitted) (holding that a party was collaterally estopped from re-litigating an issue that was resolved during the first trial by his brother and business partner, because the party could not explain "how his interests could have departed at all from his brother's or their company's"). Here, the interests of Attaway and Blakeley, with respect to the issue of personal jurisdiction over Romarm, were identical to the interests of Williams and Howe in the first action: they shared the interest of establishing that Romarm was sufficiently controlled by the Romanian government, such that it was not a separate and distinct entity that qualifies as a "person" with due process rights for purposes of personal jurisdiction. The four Plaintiffs also share an attorney in the present case—the same attorney who represented Williams and Howe, and attempted to represent Attaway and Blakely, in the first action. Furthermore, Plaintiffs' Counsel acknowledged during oral argument that Williams and Howe's interests in litigating this issue were identical to those of Attaway and Blakely. Thus, under collateral estoppel, Attaway and Blakeley are barred from relitigating the issue of whether Romarm is independent from the Romanian government.[3]

### C.  Due Process

Because Romarm is an independent entity, and therefore a "person" under the Due Process Clause, Plaintiffs must establish that Romarm has sufficient "minimum contacts" with Maryland, such that "maintenance of the suit does not offend traditional notions of fair play and

---

[3]  Romarm argues that, in the alternative, even if collateral estoppel did not apply to Attaway and Blakeley, they would be prevented from re-litigating this issue because their claims in the present case are barred by the statute of limitations. The Court does not reach the statute of limitations question because, for the reasons stated in this Memorandum Opinion, it does not have personal jurisdiction over Romarm.

substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Personal jurisdiction is discussed in terms of "general" or "specific" jurisdiction. A court has general personal jurisdiction when the defendant maintains "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). Where, as here, there is no evidence that the defendant has such continuous contacts with the forum state, a plaintiff must show specific personal jurisdiction. A court has specific personal jurisdiction when the defendant has established minimum contacts with the forum state by purposefully directing its activities at the residents of that state, and the cause of action "results from alleged injuries that arise out of or relate to those activities." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985); *see also Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995). A defendant corporation must "purposefully avail itself of the privilege of conducting activities within the forum state, and its "conduct and connection with the forum State" must be "such that [it] should reasonably anticipate being haled into court there." *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In the context of non-resident defendant companies whose only connection to a forum is that their products have ended up there, the Supreme Court first recognized a "stream of commerce" theory of personal jurisdiction in *World-Wide Volkswagen*, finding that the forum state "does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Id.* at 297-98. Subsequently, in *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102 (1987), the Supreme Court provided two theories, neither of which garnered a majority of the Court, for how personal jurisdiction might exist in a stream of commerce case. Justice

O'Connor's plurality opinion, joined by three other justices, concluded that it is not enough that a corporation place its product in the stream of commerce with the awareness that it may travel to the forum state; rather for minimum contacts to be established, there must be "an action of the defendant purposefully directed toward the forum State, such as an act that shows "an intent or purpose to serve the market in the forum State." *Id.* at 113. Justice Brennan's concurring opinion, joined by three others, reasoned that minimum contacts could be established if the defendant placed its product into the stream of commerce knowing that it eventually would be marketed and sold in the forum state and that it would benefit economically from such sales. *Id.* at 121.

In *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939 (4th Cir. 1994), the United States Court of Appeals for the Fourth Circuit, echoing Justice O'Connor's reasoning in *Asahi*, held that the test is whether (1) the defendant has "created a substantial connection to the forum state by action purposefully directed toward the forum state"; and (2) the exercise of jurisdiction would not offend "traditional notions of fair play and substantial justice." *Id.* at 945-46. In *Lesnick*, the court found no personal jurisdiction where the defendant corporation sold its cigarette filter material to plants in Kentucky and New Jersey, with the knowledge that the finished cigarettes would be sold in Maryland, but none of the defendant's conduct was "directed *toward the state of Maryland*." 35 F.3d at 946-47 (emphasis in original).

The Supreme Court recently decided a stream of commerce case in *J. McIntyre Mach. Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), where six justices agreed that there was no personal jurisdiction over an British company that directed marketing and sales efforts at the United States as a whole through a distributor, but whose only contact with the forum state was the sale of one of its machines to a resident of that state. *Id.* at 2790. Because there was no majority opinion in

*McIntyre*, Justice Breyer's concurrence, in which he concurred in the plurality's judgment but not its reasoning,[4] provides the only controlling guidance. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .") (citation and internal quotation marks omitted). In his concurrence, Justice Breyer explained that none of the Supreme Court's stream of commerce precedents would permit a "single isolated sale" of a product to a customer in the forum to be sufficient to establish minimum contacts on the part of the manufacturer, and that without a showing of a "regular course of sales" in the forum state, or a showing of "something more," such as "special state-related design, advertising, advice, marketing or anything else" that would indicate a "specific effort" by the defendant to sell in the forum, there would be no personal jurisdiction against the manufacturer. *Id.* at 2792 (Breyer, J., concurring) (internal quotation marks omitted).

The factual basis for the Court's exercise of personal jurisdiction over Romarm is even more tenuous than the facts in *McIntyre*. In *McIntyre*, the Supreme Court found no minimum contacts where the manufacturer not only encouraged its American distributor to sell its machines in the United States, but the distributor had, in fact, sold and shipped at least one of the manufacturer's machines to a customer in the forum state. 131 S. Ct. at 2791 (Breyer, J., concurring). Here, Plaintiffs' allegations to support personal jurisdiction in Maryland are limited to the assertions that Romarm engages a United States distributor, Century, to sell its firearms to

---

[4]    Justice Kennedy's plurality opinion stated that, "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum state," and thus rejected "foreseeability" of contacts with the forum state as the "touchstone of jurisdiction." *McIntyre*, 131 S. Ct at 2788-89. Justice Kennedy concluded that "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *Id.*

dealers in the United States, including in Maryland; that the weapon used in the shootings was somehow "transported" from Maryland into the District of Columbia; and that "the sale and purchase" of the weapon had occurred in Maryland. Compl. ¶¶ 3-4, 8-9, 11. At oral argument, however, Plaintiffs' Counsel acknowledged that they had no specific information that Century sold Romarm firearms into Maryland, and that their information relating to the specific firearm used in the shootings was limited to Romarm's representation in a legal filing, which states only that the firearm had been "stolen from Maryland."[5] Pl.'s Post-Hr'g Supplement, Ex. E, ECF No. 43. Thus, there is no evidence that the firearm used in the shooting was ever bought or sold within Maryland, and certainly no evidence that Romarm was a party to such a transaction.

Where Plaintiffs have not even shown that the firearm used in the shooting was sold into Maryland, the fortuity that the firearm apparently found its way into Maryland is insufficient to establish minimum contacts. *See World-Wide Volkswagen*, 444 U.S. at 298-99 (holding that a customer driving a car purchased from a New York dealer to Oklahoma did not establish that the dealer had minimum contacts with Oklahoma). Moreover, given that Plaintiffs have not established that any Romarm firearms were sold in Maryland, their allegations do not support a finding that that Romarm made any "specific effort" to sell its firearms in Maryland, such as through a regular course of sales in Maryland, or state-specific design, advertising, or marketing.[6] 131 S. Ct. at 2792 (Breyer, J., concurring); *Lesnick*, 35 F.3d at 945-46 ("Thus, we

---

[5] At oral argument, Counsel for Romarm represented that this statement was based on information received from the police investigating the shootings, and that Romarm had no internal company information that the firearm had been sold into, or was ever present in, Maryland.

[6] In a post-hearing submission, Plaintiffs offered printouts from two websites apparently hosted by companies located in Maryland that appear to sell Century firearms made in Romania that may be manufactured by Romarm. Because the Court did not grant leave for Plaintiffs to submit such material in a post-hearing submission, the Court considers it untimely. Nevertheless, even

hold that the test to be applied in considering the reach of personal jurisdiction inquires whether . . . the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state . . . ."). *See also Windsor v. Spinner Indus. Co., Ltd.*, 825 F. Supp. 2d 632, 639 (D. Md. 2011) (finding insufficient allegations to establish personal jurisdiction over a Taiwanese corporation, which directly sold its bicycle components to United States companies that maintained a "web presence in Maryland" and marketed and sold their products both throughout the United States and specifically in Maryland, because the plaintiffs "offered no details about the particular chain of distribution that brought the allegedly defective [product]" to Maryland, and "made no showing of any 'additional conduct' that would evince an intent to serve the Maryland bicycle market"); *AESP, Inc. v. Signamax, LLC*, 29 F. Supp. 3d 683, 690-91 (E.D. Va. 2014) (finding insufficient minimum contacts where the defendant manufacturer's "only contact with Virginia appear[ed] to be its sales to a nationwide distributor," which then made two sales of the product to customers in Virginia, where there was no evidence that reflected that the defendant otherwise marketed the products in Virginia, or specifically structured its relationship with its United States distributor in order to facilitate the sale of the product in Virginia).

This is not a case in which there was a "regular course of sales" into Maryland from which one could reasonably infer that that there was purposeful direction of the product into Maryland. *See McIntyre*, 131 S. Ct. at 2792 (Breyer, J., concurring); *see Hart v. Bed Bath &*

---

if the Court were to consider this information, one of the printouts contains a specific disclaimer that the Century firearm displayed is "[n]ot available" in certain states, including Maryland. Pl.'s Post-Hr'g Supplement, Ex. B, ECF No. 43. Furthermore, neither printout provides any information on the distribution chain from Century to this on-line dealer and does not establish whether these firearms are actually shipped to or from a Maryland location, and what volume of sales, if any, have been made to or from Maryland. Thus, these documents are insufficient to show purposeful conduct by Romarm to sell into Maryland.

*Beyond, Inc.*, 48 F. Supp. 3d 837, 842-43 (D. Md. 2014) (finding minimum contacts where the defendant clearly packaged and labeled its product specifically for a "clearly defined network of distributors" that defendant knew would sell the product in Maryland, and where a significant volume of the product, 1,992 bottles, had actually been sold in Maryland).

There can be no doubt, however, that Romarm has purposefully availed itself of the United States market.  Romarm has stated that it "supplied military weapons for government institutions in the United States and weapons for civilian use for legal entities-traders based in the U.S."  Pl.'s Hearing Ex. B.  It sold more than $55 million in firearms to Century in the 10-year period preceding 2012, Pl.'s Hearing Ex. A at 1, and specifically built the WASR 10, the firearm involved in the incidents in question, for the United States market, Pl.'s Hearing Ex. C at 1.  The firearms flow throughout the United States:  the police department in Washington, D.C., where assault weapons are banned, *see* D.C. Code § 7-2502.02(a)(6), has recovered at least 25 Romarm firearms in a five-year period, presumably from criminal activity.  *See* Pl.'s Hearing Ex. L.

That a plaintiff must establish that an international manufacturer specifically directed conduct toward an individual state, rather than the nation as a whole, in order for that manufacturer to be subject to personal jurisdiction does not square with the realities of the modern economy.  Today, when a company can easily target all 50 states through national and online advertising and thereby foresee that its products will be sold in those states, but can avoid directing any of its own conduct toward a particular state simply by funneling its sales through a United States distributor, it should not be able to evade jurisdiction in the states into which its product is sold.  *See McIntyre,* 131 S. Ct. at 2795 (Ginsburg, J., dissenting) (stating that the "splintered majority today turns the clock back to the days before modern long-arm statutes

when a manufacturer, to avoid being haled into court where a user is injured, need only Pilate-like wash its hands of a product by having independent distributors market it." (internal quotation marks and citations omitted)). Nevertheless, because *McIntyre* and *Lesnick* require purposeful conduct directed at Maryland specifically, and because Plaintiffs have not even shown that the firearm in question was sold in Maryland, much less that there is a regular course of sales of Romarm firearms in Maryland from which such purposeful conduct could be inferred, the Court concludes that it lacks personal jurisdiction over Romarm.

## II.  Motion for Jurisdictional Discovery

Plaintiffs have also filed a Motion for Discovery in Aid of Jurisdiction, requesting that the Court grant limited discovery that would permit Plaintiffs to determine:  (1) the extent of the Romanian government's control over Romarm, for purposes of determining whether Romarm is a separate juridical entity from the government; and (2) the extent of Romarm's contacts with Maryland, for purposes of establishing minimum contacts.  As to the first of these categories, for the reasons discussed above in Part I.B, collateral estoppel bars Plaintiffs from relitigating the issue of whether Romarm is a separate juridical entity from the Romanian government. Therefore, the Court denies jurisdictional discovery on that question.

The Court also denies jurisdictional discovery on the second category regarding the extent of Romarm's contacts with Maryland. "[T]he decision whether or not to permit jurisdictional discovery is a matter committed to the sound discretion of the district court." *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 216 n.3 (4th Cir. 2002). "When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." *Carefirst of Md., Inc. v. Carefirst Pregnancy Cntrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003).  Here,

Plaintiffs have acknowledged that the only connection to Maryland of the firearm used in the shootings in Washington, D.C. is that it was apparently stolen from someone in Maryland. It has no basis to conclude that the firearm was actually the subject of a legitimate, commercial transaction in Maryland. Even if facts are identified to support the Complaint's vague allegation that the incident weapon was at some point "bought and sold" by some unknown parties in Maryland and passed through Maryland, such an isolated sale or presence of a product would not establish personal jurisdiction. *McIntyre*, 131 S. Ct. at 2792 (Breyer, J., concurring).

Although the Complaint makes the conclusory allegation that Romarm sells its weapons to Century for distribution to dealers in the United States, "including Maryland," Plaintiffs' Counsel acknowledged at oral argument that there actually was no basis to support those allegations. Other than a belated, post-hearing submission of a web page indicating that a Maryland-based dealer engages in online sales of Century firearms manufactured by Romarm, Plaintiffs have offered no facts relating to sales in Maryland, such as identifying the actual presence of Romarm firearms at Maryland gun stores or any advertising of Romarm firearms directed to Maryland. Plaintiffs therefore have not offered sufficient information to convince the Court that jurisdictional discovery would uncover evidence of purposeful conduct by Romarm directed to Maryland, or that there would be a sufficient volume of sales that would support an inference of such conduct, particularly given that the transfer, possession, sale, purchase, or receipt of assault weapons are now banned in Maryland. Md. Code Ann., Crim. Law §§ 4-303(a), 4-301; Md. Code Ann., Pub. Safety § 5-102(r)(2). Under these circumstances, and particularly where the connection of this case to Maryland is extremely tenuous, jurisdictional discovery would be a "fishing expedition in hopes of discovering some basis of jurisdiction." *Base Metal Trading*, 283 F.2d at 216 n.3. Plaintiffs' efforts would be better spent identifying

another district in which personal jurisdiction exists.  The Court therefore declines to grant jurisdictional discovery.

## III.  Transfer

At oral argument, the Court discussed the possibility of transfer to another district where personal jurisdiction may exist.  It is unfathomable that Romarm, which has sold over $55 million of firearms into the United States, and has designed firearms specifically for the United States market, is not subject to personal jurisdiction in any state.  At oral argument, Romarm represented that the firearm used in the shootings was originally sold to Century in 2006.  Thus, it stands to reason that jurisdiction is more likely to exist in the state into which Romarm's firearms are imported, or the state whose law governs Romarm's agreement with Century, than in Maryland.  If there is a district in which personal jurisdiction exists, in light of the rulings by this Court and the United States District Court for the District of Columbia denying personal jurisdiction, venue would likely be valid in that district under 28 U.S.C. § 1391(b)(3).

Plaintiffs have now requested that this case be transferred to the District of Vermont, the state in which Century's principal place of business is located.  Under 28 U.S.C. § 1406, a court may, "in the interest of justice," transfer a case filed in the wrong venue to "any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  The Fourth Circuit has read § 1406(a) as also authorizing transfer "for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district."  *Porter v. Groat*, 840 F.2d 255, 258 (4th Cir. 1988).  This includes a transfer to another district where a defendant is subject to personal jurisdiction.  *See Johansson Corp. v. Bowness Const. Co.*, 304, F. Supp. 2d 701, 709 (D. Md. 2004); *Estate of Bank v. Swiss Valley Farms Co.*, 286 F. Supp. 2d 514, 522 (D. Md. 2003).  Although there appears to be a greater likelihood that

the District of Vermont has personal jurisdiction over Romarm than the District of Maryland, the Court cannot conclude at this time, based on the allegations in the Complaint, that personal jurisdiction exists in Vermont such that it is a district in which this case "could have been brought." 28 U.S.C. § 1406(a).  Accordingly, the Court declines to transfer the case.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is GRANTED and the Motion for Discovery in Aid of Jurisdiction is DENIED.  The case is DISMISSED for lack of personal jurisdiction.  A separate Order follows.

Date: July 17, 2015

THEODORE D. CHUANG
United States District Judge